The next case on the calendar is United States v. Guzman. Good morning. May it please the court, my name is Malvina Nathanson. I represent Alberto Ariel Guzman, who, just short of his 18th birthday, was a member of a violent street gang and to participate in the killing of a young woman and her child. There is evidence that he fired one of the shots, the second that killed the child, and received life without parole. I don't have to expound to this court the mounting evidence that keeps coming to light about the adolescent brain and its, I don't know whether to call them flaws, or just simply immaturity, and the effect that that has on the way adolescents are being treated and should be treated in the criminal justice system. It seems every day we're reading something about that. They're impulsive, they don't plan, they don't think ahead, they don't have any judgment. And that's, of course, why the Supreme Court has held that you cannot impose life without parole on someone who committed a crime when they were an adolescent without a very careful evaluation. And I want to add to that, of course, the fact that there's nothing magic about reaching 18. The courts have also recognized that the adolescent doesn't become less of an adolescent or subject to this adolescent brain problem the minute they hit their 18th birthday. You know, the evidence in the record is 25. I'm sure that's not a magic number either. But certainly into the 20s, which is important because that's when my client was sentenced. So he wasn't suddenly as mature as he was ever going to be on the date that he was sentenced. But you allude to the fact that a mandatory term not permissible after Miller and that district courts should give careful consideration to the factors that you're identifying. What I'm having difficulty seeing, reading the sentencing transcript and considering the record, is how the district court failed to give the careful consideration you're urging. And the court certainly... The court recognized the obligation under Miller. The court said all the right things. We do not dispute that. But I think to some extent the court was just mouthing what the court had to say. And I say that for a couple of reasons. Were you there? I read the transcript. I asked you were you there. You were not there. No, of course not. That's kind of a... Could I... No, wait a second. You just said that you thought the judge was mouthing the words. You're talking about a United States district court judge, Ms. Nathanson. That's... You're saying that a judge was putting a fraud on the court? No, Your Honor. What are you saying? And perhaps that was an overstatement. Perhaps it was. But I think that as the judge was... And I apologize because I certainly didn't mean to suggest that... Judge Bianco served with a great deal of distinction. I think it's regrettable that you say something like that. I can only hope that you don't hold that against my client, Your Honor. I certainly won't hold it against your client. That's all, and I apologize. I promise you, you're here to hear my voice. I'm trying to be as sincere as I can. And I appreciate, and I know you, and I know that you are being sincere, and I do apologize. But I would like to explain what made me make what may be perhaps an overstatement. In talking about the various considerations, the judge said that... The judge discounted the idea that there was this adolescent brain at work because adolescents don't plan things. He said there was a lot of planning involved in this crime. There's no evidence in the record that my client was the planner, that he was anything but an accompanier. We don't know who planned it. Martinez, the guy who was in charge of the little clique to which he belonged, was also involved from the beginning. And the planning was not such a complicated crime. They picked up the victim, took her to a deserted place, and shot her, not requiring a lot of planning. And if you look at what happened after the crime, there was three days' worth of traveling from here to there and back and forth in Queens and Nassau and Bronx before they finally figured out a way of getting these guys out of town. So I would dispute the judge's conclusion that the planning was a negative consideration. The judge also said that he didn't show that he was being influenced by his peers, which is another problem with the adolescent brain. But there's no evidence for that in the record. And, in fact, again, there was somebody who was sort of in charge of things, this guy Martinez, who seems to be involved. There's no indication that I would argue that the way this whole thing went down with all of the people involved, that he was, in fact, just acting in accordance with his peers. The judge said that the crime was particularly depraved. I don't agree with that either. It was a horrible thing to happen, and murders are horrible things to happen. Not all murders deserve life without parole. If they did, then we would have mandatory life without parole for murder. But there are depraved ways of committing murder. There's torture. You can rape and murder somebody. You can dismember the body parts. I mean, there is depravity, but I don't see that a simple, simple is probably not a good word, but two shots, two shots, and it's over is a particularly depraved way of committing murder, apart from the fact that you've killed two people, and that is not a very good thing to be doing. So I think that if you look at the factors that Miller asked you to look at and then you look at the record, that the judge's evaluation, the judge's matching of the facts in the case to the factors that the judge was supposed to consider, they just don't match, and that Mr. Guzman got as long a sentence as a 40-year-old man who had tortured and brutalized a victim before the victim died, killed the victim, dismembered the body parts, would have gotten the same sentence. It's the idea that someone who is 22 can never ever ‑‑ you know, there was a ‑‑ I'm sorry. I have a red light, and so I should not. When are you going to finish your thoughts? I appreciate that. I appreciate that. Thank you, Judge. The psychologist who examined Mr. Guzman and said that there was a possibility of rehabilitation and he saw some positive signs in him, he wasn't naïve. He said he's got to be in prison for a really long time. He said maybe when he's 50 or 60. He's talking about a 30 or 40-year sentence. Nobody thinks that Mr. Guzman should do anything less than a very long term of imprisonment. Nobody thinks that when he appeared for sentence that he didn't still manifest his gang affiliation. He was still in his low 20s. But life never, ever, never being released, we don't think that that's justified. We request that the matter be remanded for the judge to take a second look at the case, perhaps even the way it looks today, and see if perhaps the judge might on second go around and think that there is some possibility that at some long future point, Mr. Guzman would be deserving of being released from prison. Thank you very much for your time. May it please the court. My name is John Durham. I, along with my colleague, Susan Corkery, represent the United States in this matter. As the court is aware, during the trial of this matter, the government established that this defendant participated in the brutal execution-style murders of a 19-year-old woman and a 2-year-old boy. The evidence further established that this defendant pulled the trigger and shot the 2-year-old in the head. The jury convicted him on all counts, and the court sentenced him to life in prison plus 35 years. And the government respectfully submits that that sentence was both necessary and appropriate in light of the Section 3553A factors, as well as the Miller factors set forth by the Supreme Court, particularly in light of the guideline range and this defendant's conduct both before the murders and after the murders. Now, I was there throughout this proceeding, and I would like to highlight the standard in this case. The job of this court is not to substitute its judgment or to second-guess the district court's weighing of the various factors. And the reason for that is that the district court is very often in a better position to have made those types of decisions. And I think that's particularly true here when you look at the history of this case. This case was originally charged under juvenile information. So before the defendant was even transferred to adult status, Judge Bianco held a hearing where the government had to present evidence under the Juvenile Delinquency Act. And the factors for that act are remarkably similar to both the 3553A factors as well as the Miller factors. And we presented this evidence showing not just the nature of this offense, but also the defendant's age, his social background, but also significantly to the court's sentence in this case, past rehabilitation efforts. And specifically, the court found that basically since the age of 13, this defendant had been in and out of juvenile rehabilitation facilities. He had received mental health treatment, and he did not respond. Each time, soon after being released, he was rearrested and in many cases committed increasingly serious crimes, none more serious than the execution murders of Vanessa Argueta and Diego Torres. Additionally, after the defendant was arrested, he continued his affiliation with the MS-13, which he had begun when he was 12 or 13 years old. So he had already been a member of the gang for approximately five years at the time of the murders. But he continued it while he was incarcerated, both before trial and after trial. As appellant's counsel noted, he appeared at the sentencing hearing. He had his head shaved. He had hair, tufts of hair, which were fashioned into devil horns. And that also goes to the district court's reasons for sentence and the need to protect the public, was the fact that this defendant had not renounced his membership and, in fact, was reaffirming his allegiance to this violent street gang. A couple of factual points I would just like to clarify as well. Defense counsel said there was no evidence in the record that the defendant was influenced by his peers or that he tried to say this was Martinez. The facts are actually the opposite here. One of the defendant's co-conspirators, whose name is Garcia, was the one who had the initial problem with Vanessa Argueta. He raised this issue first with Mr. Guzman. They discussed what to do about it. They discussed it with another co-conspirator, Mejia. And only when they decided they wanted to carry out this murder did they go to Martinez, who was the clique leader, to authorize the murder and also to get permission to use the weapon. She also said there wasn't a lot of evidence that these murders were premeditated. There were numerous meetings, numerous conversations over a period of weeks before the killings. Now, the initial plan was just to kill Vanessa Argueta. On the evening of the murder, she brought her 2-year-old son with her. However, even then, this was not a spontaneous event. They didn't show up at her house to kill her and shoot her in her driveway or in her house. They picked her and her son up in Hempstead, New York. They drove about an hour east where they picked up Mr. Guzman. They drove another half hour east to Patshaw. They then went back to the Brentwood and Central Islip area where they waited for approximately 2 hours to get the handgun they needed to carry out the murders. And only then did they lure them into the woods and execute them. So there was substantial planning here, substantial premeditation. And the fact is, after these murders, this defendant showed absolutely no remorse. He kept a trophy from the 2-year-old victim, a bouncy ball, Diego the Explorer. It's a cartoon character. Before he fled, he gave it to an informant or someone who later became an informant. And when she told him she'd thrown it out, he mocked her and said he should have kept it and sent it to him because it had happy memories. Now, these are all things that the court was aware of in imposing a life sentence and determining that no other sentence was sufficient in order to protect the public. Unless the court has any other questions, we'll rely on our papers. I'm going to waive rebuttal since I overdid my opening, except I want to say that I never said that it wasn't premeditated. I just said that there wasn't a lot of planning involved. Thank you. Thank you both. At the start of court, the last case is on submission, so I'll ask the clerk to adjourn court. Court is adjourned.